IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ICON HEALTH & FITNESS, INC.,<br><br>                      Plaintiff,<br><br>    vs.<br><br>THE NAUTILUS GROUP, INC., f/k/a<br>DIRECT FOCUS, INC., and<br>NAUTILUS/SCHWINN FITNESS GROUP,<br>INC.<br><br>                    Defendants. | ORDER & MEMORANDUM DECISION<br><br><br><br>1:02CV00109TC |

This matter is before the court to determine whether the claims brought by Plaintiff Icon Health & Fitness, Inc., for false advertising under 15 U.S.C. § 1125(a) and false marking under 35 U.S.C. § 292 are barred or limited by the affirmative defense of laches. On motion by Defendant The Nautilus Group, Inc., to conduct a separate bench trial on the issue of laches, the court held an evidentiary hearing on August 22 and 23, 2005. Based on the evidence introduced at that hearing, the court now sets forth its findings of fact and conclusions of law on the issue of laches.

Icon's claims center around advertising statements made by Nautilus for the Bowflex machine (known as a resilient rod product). Specifically, Icon's claims focus on two categories of statements made by Nautilus: (1) that the "Power Rods" on the Bowflex machine were patented (the "Patented Power Rod statements"); and (2) that Poly-Hexamethaline-Adipamide ("PHA") was "developed exclusively by Bowflex" and "not available anywhere else in the world" ("the PHA statements").

Laches will apply to bar or limit Icon's claims if Icon inexcusably delayed in bringing the lawsuit and Nautilus was prejudiced by that delay. Here, the court finds that Icon had no reason to investigate the veracity of Nautilus' statements before 2002 and filed suit shortly after it discovered the possible falsity of those claims. The short delay between the time of discovery and the time that this lawsuit was filed was not unreasonable and did not result in prejudice to Nautilus.

## FINDINGS OF FACT[1]

### Nautilus' Business / Bowflex History

Nautilus develops, manufactures, markets and sells exercise products. Since the late 1980s, Nautilus has developed, marketed, and sold the Bowflex machine. The Bowflex machine was developed by T. Dosho Shifferaw and uses flexible, resilient rods (known as "Power Rods") to provide resistance. Sandy Wheeler and Brian Cook met with Mr. Shifferaw in 1986, began what would become eventually become Nautilus, and began marketing the Bowlfex machine.

When Mr. Cook and Mr. Wheeler first met with Mr. Shifferaw, Mr. Shifferaw had applied for, but not yet received, a patent for the Bowflex technology. Mr. Shifferaw obtained the first Bowflex patent on November 4, 1986, and a second on February 16, 1988. Beginning in 1986, Mr. Cook, Mr. Wheeler and Mr. Shifferaw began pursuing various marketing methods including direct and retail marketing and potential partnerships with larger companies. Mr. Cook, who testified at the August Hearing on this issue, has served variously as President, CEO, and Chairman of the Board for Nautilus since its inception until his retirement in 2004.

---

[1]All the factual findings are drawn from the evidence received at the August 22 and 23, 2005 hearing.

## Nautilus' Use of the Accused Statements

During its initial marketing campaign, Nautilus enrolled various retailers to sell the Bowflex machine.  In 1988, entered into an exclusive distribution agreement with Schwinn. Under this exclusive distributor agreement, Nautilus manufactured the Bowflex and prepared marketing and training materials.  Schwinn, with the assistance of Nautilus, sold the Bowflex machine through its 1,800 retailers and distributed materials containing the Patented Power Rod statements.  In 1992, Schwinn filed for bankruptcy and terminated its agreement with Nautilus.

After its agreement with Schwinn ended, Nautilus began a direct marketing campaign to sell the Bowflex machine.  In 1993, Nautilus began running television commercials and sending kits to potential customers containing extensive marketing material containing the Patented Power Rod statements.

In 1996, Nautilus began creating infomercials featuring Randy Potter, Nautilus' head of marketing. The infomercials contained the Patented Power Rod statements. From 1996 through 1999, Nautilus infomercials were shown on hundreds of television channels and there is no dispute that the infomercials were widely seen.  In 1999, Nautilus spent over $30 million marketing the Bowflex machine.

In 1995, Nautilus wanted to know the name of the material from which the Power Rods were made.  The manufacturer of the Power Rods told Nautilus that the rods were made from PHA.  Nautilus then began to include the PHA statements in its marketing campaign.

## Icon's Business

Icon is a company with global operations that manufactures and markets a wide variety of fitness products.  Brad Bearnson, general counsel and secretary for Icon, testified that Icon's core product "consists primarily of exercise equipment generally, and that would be treadmills, gym

systems, multiposition gym systems, hand-held weights . . . exercise bikes, elliptical products.

It's sort of the full gambit of exercise products . . . ."  (Transcript of the Aug. 22, 2005

Evidentiary Hearing ("Aug. 22 Tr.") at 23)  Mr. Bearnson further testified that as of August of

1999, Icon employed over 4,000 people, offered over 5,000 different products, and generated

approximately $700 million in gross revenue annually.  Mr. Bearnson testified that the health and

fitness market is extremely competitive:

> [T]here are many – probably as many as 100 or more that we would consider
> direct competitors.  And beyond that there are other competitors.  This is a market
> in which players have come into and exited frequently, and so the set of
> competitors that we consider direct competitors tends to be sort of evolving.

(Id. at 24)

Mr. Bearnson testified that patents are an important part of the industry and that Icon has

over one hundred patents with its employees named as inventors.  Despite the importance placed

on patents by Icon, it is clear that Icon does not, and cannot, monitor the claims and patents of all

of its competitors.  Mr. Bearnson explained why: "We just would not have the capability and

resources to go out and discover every claim made by every competitor regarding every product

and . . . determine the veracity of that claim." (Id. at 54)  Matt Allen, President of Icon, testified:

> [T]here is so much information, so much advertising that goes on on a daily basis,
> weekly basis, it would really not be prudent to deploy the amount of people that it
> would take to cover all of that information.  People advertise on the internet.
> They advertise in newspapers.  They advertise on billboards.  They advertise on
> television.  The infomercial business is a business in and of itself.  There's just an
> extraordinary amount of information.  And we're in the business of bringing
> products to market that we sell, and so what we do is focus on our products and
> try and understand our business and not review other people's advertising and ads
> per se.

(Aug. 22 Tr. at 138)

Colleen  Logan, Icon's vice-president of marketing, testified:

We barely have time to do the work of promoting the features and benefits of our

4

> products. We have such a vast array of products. We have literally hundreds of
> our own products. And then contained within each product, Icon has some
> wonderful innovations and really amazing benefits to the consumer, so our job as
> the marketing department is really focusing on our products and how to uniquely
> position those features and benefits and innovations to the consumer. So really
> our focus is on what we do. We don't study our competitors.

(Id. at 176) Significantly, Mr. Cook also testified that Nautilus had never undertaken the process

of verifying the truth of the claims made by all of its competitors. (Transcript of the Aug. 23,

2005 Evidentiary Hearing ("Aug. 23 Tr.") at 96)

Mr. Bearnson testified that at the relevant time here, August of 1999, Icon did not have

in-house patent counsel and simply did not have the resources to investigate all claims by its

competitors. Mr. Bearnson testified:

> Resourcewise its just impossible. Again, claims run the gambit from claiming
> certain uniqueness to a product to effectiveness kind of claims, and those would
> require that we go out and buy one of their products and test it ourselves to verify
> the claims. We just don't have those kind of resources.

 (Aug. 22 Tr. at 27) But occasionally Icon does examine competitors' products either when

patent infringement is suspected or when they are developing a similar product. Icon has, in the

past examined a Nautilus product– the Treadclimber. Mr. Bearnson explained: "We had some

patents on shocks and internal spring mechanisms and I was concerned about [the

Treadclimber]." (Aug. 22 Tr. at 76) Icon compared the Treadclimber to the patents held by Icon

to see if there was infringement. But Mr. Bearnson testified: "We don't do it with all of our

competitors. We try to be aware of our competitors but, no, we don't pull in all of your

competitors' products. There's just no way." (Id. at 79)

## The Investigation Giving Rise to the Current Claims

Mr. Bearnson testified that when Icon is bringing a new product to market, it will

investigate a directly competing product. This investigation involves getting an example of the

5

competing product, looking at the markings on that product, and looking at the competitor's literature.

Here, Icon began to investigate Nautlius' claims regarding the Bowflex when it developed its own resilient-rod exercise machine, the Crossbar, in 2001 and 2002.  Mr. Bearnson testified that in the summer of 2002, as Icon prepared to market the Crossbar,  the competition with Nautilus "came to a whole new level, and that in part gave rise to our concern."  (Id. at 57) Mr. Bearnson explained:

> Certainly we were looking at doing a similar product that had resilient rods, but it was also this time frame that Nautilus for the first time had entered our playground so to speak.  They had started to develop a retail strategy and were approaching our retail customers, and they were, from our – from the appearance, they were starting to compete for the same retail force base that we competed with, and so that gave rise to another reason to start looking at them a little closer.

(Id. at 57) It was also during this period that Mr. Allen first remembered seeing a Bowflex at Icon.

In 2002, Icon asked its outside counsel to investigate the veracity of the PHA statements and the Patented Power Rods statements.  Mr. Bearnson then notified Icon management that he believed that Nautilus' statements were false and this lawsuit was filed "approximately within 30 days or something of that time frame." (Aug. 22 Tr. at 55)

### The 1987 Meeting Between Mr. Cook and Icon

Mr. Cook testified that he began marketing the Bowflex machine in 1986 with Mr. Shifferaw and Mr. Wheeler.  And, as described above, part of this process was seeking potential marketing partners for the Bowflex machine.  Mr. Cook testified that he attended either the National Sporting Goods Association ("NGSA") trade show in 1986 or the Super Show in 1987 and met two of Icon's representatives: Scott Waterson and Gary Stevenson.  (Aug. 23 Tr. at 15).  The original Bowflex was on display at the show.

Mr. Cook testified that his initial discussions with Mr. Waterson and Mr. Stevenson led to an in-person meeting at Icon's offices in Utah in 1987.  Mr. Cook testified about his general practice for meetings of this type:

> Well, we'd either send in advance and/or bring to the meeting . . . a product sample . . . . We would have brought the marketing literature with us, brochures, videotapes, workout manuals. . . .  I  always brought copies of our patent with us.

(Aug. 23 Tr. at 17).  Mr. Cook further testified: "To the best of my recollection that patented Power Rod phrase or something close to it is something that we've used from day one in our marketing materials."  (Id. )

Mr. Cook testified that he sent marketing materials and a product sample to Icon in advance of the meeting and the product was displayed during the meeting.  According to Mr. Cook, the parties discussed the Bowflex patents, the appearance, function, and features of the machine.  He also left additional marketing materials and copies of the patents.  Icon chose not to invest in Nautilus.

While it is undisputed that Nautilus and Icon are now competitors, that was hardly the case in 1987.  Mr. Cook has established that Icon may have had access to the Patented Power Rod statements as early as 1987.  But there is nothing to indicate that Icon investigated the statements at that time, or that there was any impetus to do so.

### Icon's Awareness of Bowflex's Marketing

Nautilus has widely marketed the Bowflex through brochures and infomercials.  The product has been visible since the late 1980s.  Mr. Allen testified that he first saw a Bowflex product "at a trade show in the late 80s."  (Aug. 22 Tr. at 151)  He also testified that he recalls seeing numerous advertisements for the Bowflex machines over the course of the years: "I'm a male, and I like sports, and you can't watch [SportsCenter] without seeing some form of

advertising."  (Id. at 146)

Mr. Bearnson also testified that he had seen Bowflex advertisements: "I'm sure when I couldn't sleep at night I saw a Bowflex infomercial, but I don't know that I ever focused on that or even – I can tell you probably prior to 2002 I don't think I watched a whole Bowflex commercial through." (Aug. 22 Tr. at 81)  Mr. Bearnson testified about his perception of  the statements and claims made in those infomercials: "They didn't stand out to the extent I heard them, and I'm not sure, you know, I really focused on them ever.  They didn't stand out to me as being an issue or something that was worthy of further inquiry."  (Id. at 90) Mr. Bearnson testified: "I don't recall any substantive discussion about the Bowflex product prior to the fall of 2001."  (Id. at 91)

Despite Icon's employees' awareness of the Bowflex advertisements and its existence as a competitor, nothing in those advertisements triggered an investigation.  No investigation into the veracity of Nautilus' claims was conducted  until Icon sought to bring its own resilient-rod product to market.

During the course of this litigation, Icon produced in discovery two Bowflex brochures that it had in its possession.  Nautilus contends that these brochures show that Icon was investigating the Bowlfex machine earlier than 1999.  But the court finds that Icon obtained the brochures in 2002 during the course of other litigation.

### Icon's Awareness of the Bowflex Patents

Bill Dalebout, the head of Icon's product development department, is listed as the inventor on many of Icon's patents. Mr. Dalebout, who was not called as a witness at the August 2005 hearing, was aware of the Bowflex patents as early as spring of 2000 and obtained copies of them at that time.  But this evidence, standing alone, does not show that Icon knew of the alleged

falsity of the Nautilus statements or had reason to investigate.  Mr. Bearnson testified:

> Bill [Dalebout] periodically pulls patents on products, ours and others, to review for certain features.  And it may be he's in the process of developing a product.  It may just be a matter of curiosity with him.  But I know he does that periodically.  But that's for a purpose that he has in his head, and that doesn't necessarily come to my attention.  And Bill is certainly not one to review promotional materials or advertising . . . .

(Aug. 22 Tr. at 125)  Mr. Allen further testified:

> [Mr. Dalebout is] kind of – we call him in the building a U.F.O., kind of an unidentified flying object.  He's all over the board.  He's a design person, and they tend to be that way.  I don't know what he does, you know, every day all day long.  But I do know in 2001 or so when we were developing [the Crossbar] that . . . he was working on something.

(Id. at 163)

## CONCLUSIONS OF LAW

### False Advertising Claims

Laches is a valid defense to Lanham Act claims.  See Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 835 (9th Cir. 2005); Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813, 820 (7th Cir. 1999).  The laches defense rests on proof of two elements: (1) inexcusable delay in instituting suit; and (2) prejudice to the defendant as a result of the delay.  Brunswick Corp. v. Spinit Reel Co., 832 F.2d 513, 523 (10th Cir. 1987); Hot Wax, 191 F.3d at 820.  Each case "must be determined according to its own peculiar circumstances."  Potash Co. of America v. Int'l Minerals & Chemical Corp., 213 F.2d 153, 154-55 (10th Cir. 1954).

A plaintiff's delay is presumed to be unreasonable if the most analogous state statute of limitations period has run.  See Jarrow, 304 F.3d at 838; Conopco Inc. v. Campbell Soup Co., 95 F.3d 187, 191 (2d Cir. 1996).  Here, the parties agree that the applicable statute of limitations is the three-year limitations period applicable to claims for fraud under Utah Code § 78-12-26(3) and that the relevant time frame is August of 1999 (three years before the suit was filed).    The

Utah statute provides that the limitations period begins to run upon "discovery by the aggrieved party of the facts constituting the fraud or mistake." U.C.A. § 78-12-26(3). Accordingly, Icon's delay in filing suit is measured from the time Icon knew or should have known of the alleged injury. See Baldwin v. Burton, 850 P.2d 1188, 1196 (Utah 1993).

The discovery rule applies to toll the statute of limitations until facts forming the basis for the cause of action are discovered or "in the exercise of reasonable diligence, should have been discovered." Rappleye v. Rappleye, 99 P.3d 349, 353 (Ut. Ct. App. 2004) (citing Jensen v. IHC Hosps., Inc., 82 P.3d 1076, (Utah 2003)); see also Baldwin v. Burton, 850 P.2d 1188, 1196 (Utah 1993). Actual knowledge or constructive knowledge may suffice to trigger the applicable statute of limitations. Rappleye, 99 P.3d at 355-56. Icon claims that it did not have actual or constructive knowledge of the falsity of the statements until 2002. But Nautilus argues that Icon had reason to investigate much earlier.

A party has constructive notice "where information or knowledge of a fact is imputed to a person by law 'because he could have discovered the fact by proper diligence, and his situation was such as to cast upon him the duty of inquiring into it.'" Id. at 356 (citing In re Discipline of Sonnenreich, 86 P.3d 712 (Utah 2004)). "Reasonable diligence" has, in turn, been defined as "[a] fair, proper and due degree of care and acting, measured with reference to the particular circumstance" or the "diligence, care or attention as might be expected from a man of ordinary prudence and activity." Beauty Time, Inc. v. VuSkin Systems, Inc., 118 F.3d 140, 144 (3d Cir. 1997). Duty to inquire is triggered by a "reason to awaken and suggest investigation." Id.; see also Baldwin, 850 P.2d at 1196 ("a knowledge of facts which would have put an ordinarily prudent man upon inquiry which, if followed up, would have resulted in a discovery of the fraud, [was] equivalent to actual discovery."). Here, the question is not when Icon became aware of

10

Nautilus' statements, but when Icon had reason and a duty to inquire into the falsity of those statements.

At the time of the 1987 meeting between Mr. Cook and Icon, the Bowflex machine was not a competitive product.  The materials provided to Icon may have contained the accused statements, but there is nothing to suggest that this meeting and the materials provided would have put Icon on notice that it should investigate Nautilus' marketing claims.

Nautilus' advertising of the Bowflex machine did not trigger Icon's duty to investigate. The health and fitness market is filled with numerous competitors and products and the evidence showed that these companies do not, and cannot, investigate the veracity of all of their competitors' advertising claims.  The same logic applies to Nautilus' conspicuous placement of the Bowflex patent numbers.  Absent a reason to investigate the veracity of Nautilus' claims, the availability of the patent numbers would not trigger an investigation into the veracity of advertising claims.

There is no evidence to suggest that, by obtaining the Bowflex patents, Mr. Dalebout triggered Icon's duty to investigate Nautilus' claims.  There is nothing in the record that sheds any light on why Mr. Dalebout obtained the patents or what he did with them.

The court concludes that Icon "discovered" the alleged falsity of the statements in the summer of 2002 and promptly filed suit.  There was no unreasonable delay.  Nautilus contends is has been prejudiced both economically and evidentiarily by Icon's delay in bringing suit.  But Nautilus suffered no prejudice as a result of the very short interval between Icon's discovery of the alleged falsity and its bringing suit.

Accordingly, the defense of laches does not apply to bar Icon's claims for false advertising.

**<u>False Marking Claims</u>**

A five-year statute of limitations does exist for false marking claims and the presumption of laches may arise if Icon failed to bring its false marking claim within that period.  <u>See</u> <u>Conopco</u>, 95 F.3d at 191; <u>Tandy Corp. v. Malone & Hyde, Inc.</u>, 769 F.2d 362, 365 (6th Cir. 1985).  Accordingly, laches <u>could</u> apply if Icon knew, or should have known, that Nautilus' "Patented Power Rods" statements were false before August of 1997. But the court has found that Icon did not have reason to know of the falsity of the statements before 2002 and the presumption of laches does not apply.  The court need not examine whether laches applies to false marking claims brought within the statute of limitations period because of the finding that the delay was not unreasonable and that Nautilus was not prejudiced by the delay.


SO ORDERED this 24th day of October, 2005.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Judge