IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ICON HEALTH & FITNESS, INC., <br><br>              Plaintiff, <br><br>      vs. <br><br> THE NAUTILUS GROUP, INC., f/k/a DIRECT FOCUS, INC., and NAUTILUS/SCHWINN FITNESS GROUP, INC. <br><br>              Defendants. | ORDER & MEMORANDUM DECISION <br><br><br> 1:02 CV 109 TC |

      For over a decade, Defendant The Nautilus Group, Inc. incorporated statements into its promotional materials indicating that a component of its premier product was patented. The component in question is not patented and a jury unanimously concluded that Nautilus's actions violated the Patent Act, which prohibits the promotion of an unpatented article by falsely marking that article as patented. This matter is before the court for a determination of the number of false-marking offenses committed by Nautilus and the imposition of a fine commensurate with that number. Additionally, the court considers Plaintiff Icon Health & Fitness, Inc.'s Request for a Finding of Exceptionality Pursuant to 15 U.S.C. § 1117(a) and 35 U.S.C. § 285, which allow for the recovery of attorney fees in "exceptional" cases. The court held a hearing on both issues March 3, 2006.

      The court concludes that Nautilus committed 650 punishable false-marking offenses and therefore imposes a fine of $325,000. The court rejects Icon's request for a finding of exceptionality. The jury unanimously found by a preponderance of the evidence that Nautilus

willfully committed patent infringement and deliberately engaged in false advertising and false marking. But there is no clear and convincing evidence before the court to support the conclusion that Nautilus's behavior was so exceptionally egregious that Nautilus should be required to pay the attorney fees incurred by Icon in this matter.

## **General Background**

Icon and Nautilus are both in the business of manufacturing and marketing various types of exercise devices and machines. The BowFlex exercise machine is one of the premier products of the Nautilus line and Nautilus has effectively marketed BowFlex for over two decades. Nautilus markets BowFlex by sending brochures and catalogs directly to consumers, advertising in print and on television, displaying product information on the Internet, and by placing products in retail stores. Nautilus has disseminated a substantial amount of marketing information over the years. Brian Cook, testifying on behalf of Nautilus, indicated that from 1993 to 1999 Nautilus likely distributed brochures "in the millions" and that Nautilus's television spots appeared on "hundreds, maybe thousands" of stations. (Evidentiary Hearing Re: Laches (Continued), August 23, 2005, 49, 120.)

Although Nautilus has had a significant presence in the exercise market for many years, the overall theme of Nautilus's marketing materials has not changed appreciably. The company's promotional materials focus on displaying healthy, fit individuals using BowFlex, promising an improved physique if the machine is used for a certain amount of time each week, and providing affordable payment options. (See, e.g, Trial Transcript, Nov. 8, 2005, 44:19-22, 44:25-45:2; Trial Transcript, Nov. 9, 2005, 53:22-25, 54:1-12; Trial Transcript, Nov. 8, 2005, 194:2-12; Trial Transcript, Nov. 10, 2005, 111:4-16, 24-25.)

Before the present dispute arose, Nautilus's marketing materials frequently used

statements indicating that the company's "Power Rods," a core component of the BowFlex machine that provide resistance to the user, are patented, or are manufactured with patented technology. In reality, the Power Rods are not patented, nor are they made with patented technology.

Icon filed this suit, alleging various causes of action against Nautilus, including trademark infringement, false advertising, and false marking. (See Compl.) These claims were tried to a jury, which returned a special verdict finding that Nautilus (1) infringed Icon's "Soft Strider" mark, which is used in connection with treadmills; (2) engaged in false advertising when marketing its Power Rods; and (3) engaged in false marking by incorrectly indicating that the Power Rods were patented or were made with patented technology. (Special Verdict, 1-2.)

The court notes that the parties contest whether the special jury verdict rendered in this case is binding or merely advisory. The court has received briefing on that issue and has taken the matter under advisement. The court notes that, regardless of its binding or advisory nature, the verdict rendered in this case, at least so far as liability is concerned, is sufficiently supported by the evidence presented at trial and, even if not binding, the court would adopt the jury's finding of liability against Nautilus on all claims. Given this fact, the court proceeds with its analysis guided by the jury's finding by a preponderance of the evidence that Nautilus committed trademark infringement and engaged in false advertising and false marking.

## Analysis

In this order, the court takes up two issues for determination: (1) how many false-marking offenses did Nautilus commit when marketing its BowFlex machine, and (2) whether Nautilus's actions in infringing Icon's Soft Strider mark and in falsely advertising and marketing its Power Rods were so egregious that Nautilus should be forced to pay Icon's attorney fees in this matter.

**I. False Marking**

The United States Code mandates that "[w]hoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word 'patent' or any word or number importing that the same is patented for the purpose of deceiving the public . . . [s]hall be fined not more that $500 for every such offense." 35 U.S.C. § 292.

The court previously held that while a jury may decide whether a defendant committed the act of false marking, it is within the discretion of the court to determine the number of offenses that have occurred and to impose the appropriate fine. (Order & Memorandum Decision, August 31, 2005, 6-7 ("[T]he court finds that the ultimate determination regarding what constitutes an 'offense,' the number of offenses of false marking, and the fine to be imposed, are questions of law within the discretion of the court.").)

At trial, Icon put forth considerable evidence that Nautilus advertised its Power Rods as patented when in reality Nautilus held no patent that specifically applied to the Power Rods. For example, Icon introduced numerous marketing materials that contained statements such as, "[w]e extrude our patented power rods under precise manufacturing processes" and "Bowflex's patented Power Rods are precisely manufactured under extreme quality control measures." (See, e.g., Icon Trial Exs. 3-4.) Nautilus objected to the Icon's characterization of the use of such statements as a willful attempt to deceive the public, and argued that the employees responsible for the use of such statements believed that the statements were accurate because the Power Rods are a component of the larger BowFlex machine, which Nautilus claims in two separate patents.

After hearing all the evidence, the jury unanimously concluded that Nautilus had promoted an unpatented article (the Power Rods) as patented and that Nautilus did so with the purpose of deceiving the public, a violation of 35 U.S.C. § 292. As noted, the court concludes

that the jury's verdict in this regard is supported by the evidence in the record. With liability for false marking established, it is now the task of this court to exercise its discretion and determine the number of false-marking offenses that Nautilus committed and impose an appropriate fine.

Making such a determination is far from a simple task. Case law addressing what exactly constitutes a false-marking "offense" is scant. Complicating matters further is the reality that Nautilus has represented its Power Rods as patented for many years in a variety of media. This fact distinguishes the present case from the type of situation at issue in the false-marking cases relied upon by the parties, in which the false-marking activity is comparatively quite small. The court is simply unaware of any reported case that deals with a false-marking claim that encompasses such a great length of time and widespread use of false-marking in advertising.

Further complicating this issue is the variety of approaches that courts have taken when determining the number of false-marking offenses that a party has committed. For example, in Precision Dynamics Corp. v. American Hospital Supply Corp., 241 F. Supp. 436, 447 (S.D. Cal. 1965), the court held that the use of a false-marking statement in two separate publications resulted in two false-marking offenses. In accordance with this approach, a court could simply count the number of distinct publications in which a false-marking statement occurs to determine the number of offenses.

But other case law indicates that courts should consider a divergence in time between marking activities when calculating the number of offenses committed. See, e.g., London v. Everett H. Dunbar Corp., 179 F. 506, 509 (1st Cir. 1910) (if evidence shows "divergence of time and circumstances" between marking activity, multiple offenses may be found); Krieger v. Colby, 106 F. Supp. 124, 131 (S.D. Cal. 1952) ("[T]he proof must be sufficiently specific as to time and place and circumstances to show a number of distinct offenses of marking, although it

need not show the specific date of each."). In this vein, courts have suggested and imposed penalties that track the amount of time that false-marking occurs. For example, in <u>Krieger</u>, the court concluded that the defendant committed eight separate offenses when on eight different days he attached tags to hats indicating falsely that the hats were patented. 106 F. Supp. at 131; <u>see also</u> <u>Brose v. Sears, Roebuck & Co.</u>, 455 F.2d 763, 766 n.4 (5th Cir. 1972) (suggesting that a court can tie the number of false-marking offenses to a reasonable increment of time--finding one offense for each week false-marking statements are used, for example).

Anticipating the difficult task of determining the number of false-marking offenses committed by Nautilus, the court originally drafted a jury instruction synthesizing the relevant case law to submit the question to the jury for an advisory recommendation. Although that instruction was ultimately not sent to the jury, the parties' damages experts used that instruction in preparing reports advising the court of their opinions concerning the number of false-marking offenses Nautilus committed. The jury instruction reads as follows:

> The false marking statute imposes liability on an offender for each separate false marking "offense." An "offense" is defined as "a single continuous act." Each advertisement falsely stating that something is patented when it is not patented is an instance of false marking under the statute. A continuous advertisement constitutes a single false marking offense regardless of how many times that advertisement was reprinted or re-broadcast. An advertisement may constitute a separate offense from other advertisements using the same language if that advertisement is distinct in time and circumstance.

(Order & Memorandum Decision, August 31, 2005, 8.)

Both parties had the same raw material to work with in advocating for their respective positions on the number of offenses committed by Nautilus: this court's proposed jury instruction and twenty-three[1] different occurrences of false-marking statements identified by Icon

---

[1] Although false-marking statements were identified in only twenty-three separate advertising "vehicles," such as brochures and television spots, each of those twenty-three vehicles were reproduced in significant numbers and were circulated over a significant period of time.

that were found in four different media types: print advertising, television spots, DVD/Video kits, and the Internet. Nevertheless, at the evidentiary hearing held in this matter, the parties' experts reached far different conclusions concerning the potential number of false-marking offenses.

Icon's expert, Lance E. Gunderson, testified that the evidence in the record supports the conclusion that Nautilus committed anywhere from 915 to 5600 separate offenses. In contrast, Nautilus's expert, Cate Elsten, testified that she believed it would be proper to conclude that Nautilus committed only one false-marking offense. A brief explanation of how the experts arrived at such disparate conclusions is warranted.

Mr. Gunderson takes the position that there was a separate offense each time Nautilus made a decision to either initially introduce a false-marking statement into the marketplace or to keep a previously released statement in the marketplace. According to Mr. Gunderson, the court should determine the number of offenses by looking at the budgeting process Nautilus used and find one offense for each time money was allocated to distribute the advertisement in question.[2] Under Mr. Gunderson's approach, the allocation of money to pay for a particular advertisement is the equivalent of deciding to introduce the statement contained in that advertisement to the public or a decision to continue to use a previously released statement.

For example, if Nautilus budgeted money to brochures on a monthly basis and one brochure was continually distributed for an entire year, Mr. Gunderson would consider that as twelve separate offenses. Mr. Gunderson adopted this approach to account for this court's instruction that the use of one advertisement could result in multiple offenses if use of the

---

[2]To be fair, Mr. Gunderson testified that his analysis was limited by the information provided by Nautilus during discovery. Presumably, if Mr. Gunderson had had access to additional information, he would have possibly adopted a different method of evaluating the number of offenses.

advertisement was repeated under different circumstances or at a different time. As mentioned, Mr. Gunderson used alternate calculation methods in an attempt to pinpoint the number of offenses, which resulted in his proposed range of 915 to 5600 offenses.

      Ms. Elsten's approach focused more on the court's language in the jury instruction suggesting that a continuous act constitutes only one offense. According to Ms. Elsten, the most desirable method of calculating the number of offenses is to determine when one advertisement ends and another begins. Specifically, Ms. Elsten chose a "campaign approach," whereby one advertising campaign, regardless of the number of advertisements or the type of media used, would constitute only one offense. Ms. Elsten's position was that Nautilus's marketing strategy has remained essentially consistent in theme and content since the time the false-marking statements were initially identified. Accordingly, she concluded that Nautilus should be found guilty of only one offense. But Ms. Elsten conceded that, even under the campaign approach, the court could conclude that Nautilus committed four offenses because it used four different types of media to spread its marketing message. Such a conclusion would consider the use of each media type a distinct circumstance of dissemination. Finally, while Ms. Elsten certainly did not endorse the position, she conceded that it may be reasonable to conclude that each of the twenty-three identified advertising vehicles counts as a separate offense.

      It appears that the proper number of offenses lies between the approaches championed by the parties' respective experts. To begin with, all parties agree that Nautilus should not be fined for each and every copy of a false-marking statement that it produced. As stated in <u>London</u>, 179 F. at 508, "[t]he statute does not measure the penalty by the extent of publication, but affixes the penalty regardless of the fact of publication. It could hardly have been the intent of Congress that penalties should accumulate as fast as a printing press or stamping machine might operate."

Indeed, given the breadth of Nautilus's marketing activities, such a fine would be nothing short of astronomical.[3]

At the same time, it could hardly have been the intent of Congress that a company should be fined only $500 for false marking when that company used false-marking statements for over a decade in nearly two dozen different advertising vehicles that reached a staggering number of consumers. An interpretation of the false-marking statute that imposes such a minimal fine on a company that has engaged in prohibited conduct on many occasions over the course of many years would eviscerate the statute and must be rejected.

Similarly, while the court agrees with Ms. Elsten that use of different media types is sufficient to meet the false-marking statute's requirement that each offense be distinct in circumstance, concluding that Nautilus's activities resulted in only four offenses under the false-marking statute elevates technicalities of form over substance and turns a blind eye to the extent of Nautilus's false-marking behavior.

But the court also has serious reservations about the approach adopted by Mr. Gunderson. By focusing on marketing decision making, Mr. Gunderson's approach attempts to accomplish the difficult task of identifying each instance of fraudulent intent that is coupled with an overt act of marking. See id. ("[T]he statute must be read as making the fraudulent purpose or intent to deceive the public the gravamen of the offense, and the marking as the overt act whereby the intent is made manifest.") And although Nautilus's budgeting information gives evidence relating to the manner and timing of marketing decisions, it is circumstantial evidence at best because the record does not indicate whether a marketing decision actually accompanied the continuation of a given budgetary line item from one budgetary period to the next. In other

---

[3] In his report, Mr. Gunderson estimated that using such a calculation method would result in over nineteen million offenses.

words, there is no guarantee that Nautilus, by funding an advertisement each month for twelve months made twelve separate decisions regarding the false-marking statements. The budgetary process could be nothing more than a multi-month administrative implementation of one marketing decision.

Nautilus has not provided the court with any evidence that meaningfully undercuts Mr. Gunderson's identification of twenty-three different advertising vehicles containing false-marking statements. Therefore, at the very minimum, Nautilus has committed twenty-three false-marking offenses. This is so because Nautilus distributed twenty-three distinct pieces of marketing material, spanning four media types that contained false-marking statements. For example, Nautilus produced ten different brochures that contained a statement indicating that its Power Rods were patented. Although the "theme" of these brochures is essentially identical, and even though some of the brochures contain the identical false-marking statement that appears in other advertising vehicles,[4] the court is convinced that each of the ten brochures constitutes a separate offense because a revamped brochure constitutes a sufficiently distinct circumstance from a previous brochure. The revamping and redistribution of a marketing vehicle marks a clear point in time at which Nautilus essentially reenters the marketplace with a false-marking statement. Such an action can be considered either the use of a new false-marking statement or the reaffirmation of a previously released false-marking statement. Either way, the court is convinced that such an action constitutes a new and separate offense. The same analysis is applicable to Nautilus's activities in other media.

The more troublesome task is determining whether Nautilus's use of a particular

---

[4] Although twenty-three distinct advertising vehicles are identified in the record, the court is aware of only eight false-marking statements. In some advertisements, Nautilus simply reused a false-marking statement that appeared in an earlier advertising vehicle.

marketing vehicle resulted in more than one false-marking offense.  Nautilus attacks the budgeting approach championed by Mr. Gunderson by pointing out that there is no evidence that the accounting practices of Nautilus correspond with its decisions to circulate marketing materials.  But specific evidence (such as dates of printing and distribution) are not necessarily required before a court can draw a reasonable conclusion concerning the number or offenses committed.  If "the evidence show[s] such divergence of time and circumstances as to make one act of marking separable and distinct from other acts of marking," then separate offenses can be found.  See id. at 509.  "For example, proof of one act of marking in June, and of a distinct and separate act of marking in July, might be sufficient to show two offenses, though the plaintiff were unable to fix the exact date in either month."  Id.

     As the London court points out, "the gravamen of the offense" is properly considered "the fraudulent purpose or intent to deceive the public." Id. at 508.  Certainly, the initial decision to circulate false-marking statements evidences such an intent.  Additionally, the court concludes that the purpose of the "divergence in time and circumstance" component of the offense analysis is designed to capture and penalize an ongoing or unabated intent.  Therefore, the court concludes that the "act" punished by the false-marking statute is not only the act of marking, but also the act of using that false mark to deceive the public.  See 35 U.S.C. § 292 ("Whoever . . . uses in advertising . . . the word 'patent' . . . for the purpose of deceiving the public . . . [s]hall be fined not more than $500 for every such offense.").  To hold otherwise would lead to the absurd result that the statute designed to penalize false marking would provide no incentive to a party such as Nautilus to discontinue distribution of improper statements.

     The record indicates that Nautilus used false-marking statements in advertising from January 1992 until June 2004. During that time, the manner in which the false-marking

statements were circulated varied by the type of media used and, in some cases, used slightly different language.  Considering the breadth of this false-marking activity, it is reasonable to conclude that Nautilus committed at least one new offense each week that false-marking statements were used.  The record indicates that Nautilus used such statements for at least 150 months, or 650 weeks.  The court therefore imposes a fine of $325,000 on Nautilus.  Given that Nautilus systematically incorporated the false-marking statements into its various marketing materials for over a decade, a finding of 650 offenses is far from unreasonable.  As discussed, the court is certainly aware that other factors beyond time could be considered to further distinguish the circumstances under which false-marking statements were circulated (e.g., media type and variations in language or context) but finds that relying upon a distinction of time alone adequately serves the purpose of the false-marking statute in this case.  See Brose, 455 F.2d at 766 n.4 (5th Cir. 1972) (suggesting that a court can tie the number of false-marking offenses to a reasonable increment of time--finding one offense for each week false-marking statements are used, for example).

## II. Exceptionality

Icon successfully convinced the jury that Nautilus infringed Icon's Soft Strider mark, and engaged in false advertising and false marking.  Icon now claims that it is entitled to recover the attorney fees that it incurred in prosecuting this suit, arguing that Nautilus's actions were so egregious that this case can properly be considered exceptional, which would justify an award of attorney fees under 15 U.S.C. § 1117(a) and 35 U.S.C. § 285.

Both the Lanham Act and the Patent Act allow recovery of attorney fees in "exceptional" cases.  See 15 U.S.C. § 1117(a)(3) and 35 U.S.C. § 285.  The exceptionality standard is a demanding one and the party seeking attorney fees must establish egregious conduct on the part

of the defendant by clear and convincing evidence.  See Plastic Container Corp. v. Continental Plastics, 708 F.2d 1554, 1560 (10th Cir. 1983) (before an award of attorney fees is appropriate under the Patent Act, the claimant must establish by clear and convincing evidence that the defendant's actions involved "such misconduct . . . as to constitute fraud on the patent office or conduct so unfair and reckless as to make it unconscionable for the prevailing party to sustain the expense of counsel."); VIP Foods, Inc. v. Vulcan Pet, Inc., 675 F.2d 1106, 1107 (10th Cir. 1982) (before an award of attorney fees is appropriate under the Lanham Act, the claimant must establish by clear and convincing evidence that the defendant's actions were "malicious, fraudulent, deliberate or willful.").  Finally, the court notes that the decision to award attorney fees, even if the case is deemed exceptional, remains within the discretion of the court.  See S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc., 781 F.2d 198, 201 (Fed. Cir. 1986) ("Even an exceptional case does not require in all circumstances the award of attorney fees. . . . The trial judge is in the best position to weigh considerations such as the closeness of the case, the tactics of counsel, the conduct of the parties, and any other factors that may contribute to a fair allocation of the burdens of litigation as between winner and loser.").

     Icon places a high premium on the jury's conclusion that Nautilus's actions were deliberate and willful.  But the jury was charged with determining whether Nautilus's acts were willful and deliberate by a preponderance of the evidence.  Before attorney fees can be awarded under the Lanham and Patent acts, the court must be persuaded by clear and convincing evidence that the defendant's actions were particularly egregious.  See, e.g., Q-Pharma, Inc. v. Andrew Jergens Co., 360 F.3d 1295, 1304 (Fed. Cir. 2004) (affirming the district court's denial of attorney fees in Patent Act case where clear and convincing standard of proof was not met); Scott Fetzer Co. v. House of Vacuums, 381 F.3d 477, 490 (5th Cir. 2004) (stating that exceptionality

under the Lanham Act must be established by clear and convincing evidence).  The court concludes that Icon has failed to meet this very demanding standard of proof.  The court will briefly explain its reasoning in relation to each of Icon's claims.

**A.  False Advertising**

Even though the jury concluded by a preponderance of the evidence that Nautilus willfully and knowingly engaged in false advertising, the court is not convinced, when all the facts are considered, that Icon's case against Nautilus was exceptional.  To begin with, the record contains no sufficiently persuasive evidence indicating that Icon suffered damages as a result of the false advertising.  See VIP Foods, 675 F.2d at 1107 (lack of damages weighs against a finding of exceptionality).  Also, there is a significant amount of evidence in the record indicating that the public was not influenced by the statements.  (See, e.g, Trial Transcript, Nov. 8, 2005, 44:19-22, 44:25-45:2; Trial Transcript, Nov. 9, 2005, 53:22-25, 54:1-12; Trial Transcript, Nov. 8, 2005, 194:2-12; Trial Transcript, Nov. 10, 2005, 111:4-16, 24-25.)

Further, Nautilus put forward evidence supporting its contention that the false statements in question were not made willfully.  For example, Mr. Cook and Randal Potter both testified that they believed the statements were accurate because the Power Rods were part of the BowFlex machine, on which Nautilus holds two patents.  Similarly, despite Icon's allegations to the contrary, there is some credible evidence in the record indicating that Nautilus's statements regarding the material composing the Power Rods were not made with the intent to willfully and deliberately mislead.  Although the Power Rods are made of Nylon, a readily available substance, Nautilus buys the rods from a company called Quandrant, which developed a shaping process for the Nylon exclusively for the BowFlex machine.  Therefore, even though composed of a commonly found substance, there is some basis to Nautilus's suggestion that its Power Rods

are unique. Additionally, while Nautilus used the term "Poly-Hexamethanline-Adipamide" in lieu of the more commonly used "Nylon," Mr. Cook testified that the term was used not with the intent to mislead the public about the nature of the Power Rods, but because that was the term Quadrant engineers used when discussing the substance with him.

Finally, Icon exaggerates the evidence that Nautilus continued to use the statements in question after being informed that they may be misleading. There is evidence in the record that Nautilus took steps to remove the statements after the issue was brought to its attention. Although a slightly altered, but ultimately still false statement about the Power Rods appeared on a Web site after Nautilus was put on notice that the statements were potentially improper, the record does not establish by clear and convincing evidence that Nautilus continued to promulgate such statements willfully and deliberately. Perhaps Nautilus could have taken more aggressive and effective steps to eliminate the problematic statements, but the court is not convinced on the record before it that Nautilus's actions were egregious enough to justify awarding Icon attorney fees.

**B. Trademark Infringement**

Icon claims that Nautilus's infringement of Icon's Soft Strider mark is exceptional because Nautilus behaved willfully, deliberately, and knowingly and continued to infringe the mark after being put on notice by Icon. While the evidence in the record is sufficient to support Icon's willful infringement claim by a preponderance of the evidence, the court concludes that Icon's infringement claim presented a close question and therefore determines that there is not clear and convincing evidence that Nautilus's actions were deliberate or willful.

There is conflicting evidence in the record concerning whether Nautilus had knowledge of the Soft Strider mark before it adopted its own SoftStride mark. Icon put forward evidence

that Nautilus knew or was likely to know about the mark given Icon's presence in the marketplace and testimony from Nautilus employees indicating that Nautilus tracked the activities of its competitors. But Nautilus employees testified that they were unaware of the Soft Strider mark at the time Nautilus adopted the mark SoftStride. The evidence is too much in conflict to support a conclusion by this court that clear and convincing evidence establishes that Nautilus's infringement was deliberate and willful.

As with Icon's false advertising claims, the court finds Icon's allegation that Nautilus continued to infringe the Soft Strider mark after being put on notice by Icon to be somewhat exaggerated. After Nautilus was notified by Icon about the potential infringement, Nautilus ceased placing the mark on its treadmills and adjusted its advertising accordingly. Nautilus admits that it inadvertently used the SoftStride mark after being notified by Icon of the potential infringement. But there is simply no clear and convincing evidence to suggest that Nautilus's continued use of the mark was something other than what Nautilus claims it to be: inadvertent. Therefore, the court concludes that Icon has failed to establish that its infringement claim is exceptional and denies the requested attorney fees.

## C. False Marking

This claim is closely related to Icon's false advertising claims. As discussed in relation to those claims, there is evidence in the record indicating that Nautilus did not believe the statements in question to be incorrect. The court is well aware that Icon submitted sufficient evidence to establish by a preponderance of the evidence that Nautilus did make the statements deliberately and willfully with the intent to deceive the public. But the evidence in the record does not clearly and convincingly establish that Nautilus's behavior was deliberate and willful. As a result, a finding of exceptionality is not warranted and the court denies Icon's request for

attorney fees.

## Conclusion

Nautilus used false-marking statements in various marketing materials for over a decade. After reviewing the evidence supplied by the parties, the court concludes that Nautilus committed 650 separate offenses and therefore imposes a fine of $325,000. The court DENIES Plaintiff Icon's Request for a Finding of Exceptionality Pursuant to 15 U.S.C. § 1117(a) and 35 U.S.C. § 285. Although the jury's finding of liability is adequately supported by the record, the court considers this a close case. There is no clear and convincing evidence that Nautilus's actions were willful and deliberate.

SO ORDERED this 23rd day of March, 2006.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Judge